ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --       )
           )
Rhodes Research      )   ASBCA No. 59414
           )
Under Contract No. W9124D-14-P-0133   )

APPEARANCE FOR THE APPELLANT:    Ms. Stephenne L. Rhodes
                 Owner

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
                   Army Chief Trial Attorney
                   MAJ Jamal A. Rhinehardt, JA
                   Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE PAUL

This is a timely appeal of a contracting officer's (CO's) final determination of appellant Rhodes Research's (Rhodes') settlement proposal following the termination of its commercial items contract for the convenience of the government. The Contract Disputes Act, 41 U.S.C. §§ 7101-7109, is applicable. The CO found that Rhodes had completed work in the amount of $7,186.21; and Rhodes contends that it is entitled to an additional payment. We deny the appeal.

## FINDINGS OF FACT

1. The Army promulgated Solicitation No. W9124D-14-Q-5105 in order to install a new audio/visual (A/V) system in the chapel at Fort Knox, Kentucky. This was a small business set-aside, and the end date for submitting bids was 10 February 2014 at "13:30 EST." (R4, tab 3) A detailed Performance Work Statement (PWS) accompanied the solicitation. Subparagraph 1.1, "Scope of Work," described the contractor's general responsibilities, in part, as follows:

> 1.1   ...The contractors [sic] shall design and install
> [a] sanctuary eight speaker system, video
> teleconference system, video presentation system,
> mixing console, and bluray player. This is a non-
> personnel services contract to provide the removal of
> old A/V equipment and installation of an audio and
> video solution to include multimedia capabilities.

(R4, tab 2 at 1)

2. An "EQUIPMENT LIST" attached to the PWS described the various components to be installed in detail to include 45 specific components. All of the components were listed by brand name and model number. For example, the contractor was required to install four Bose Room Match speakers, four Bose Panaray 310M speakers, two Bose PowerMatch amplifiers, a BSS Soundweb signal processor, a Radial Engineering Pro Class Passive 1 Channel Multimedia Direct Box with RCA inputs, a Sennheiser Wireless Microphone system, a Countryman E6 directional earset, a Sennheiser Active splitter kit, an Evolution G3 Rackmount kit, and a Sharp BD-AMS20U Blu-ray DVD player. In addition, the contractor was to install a Furman PS-8RII Sequenced Power Distribution System, a Furman MP-20 Duplex Outlet amplifier, a Soundcraft Expression 1 sound system, an AMX panoramic tabletop touch panel, a Mediasite RL HD-SDI Media Recorder, a Vaddio High Definition Camera Control System, a Vaddio Production View Rack, Vaddio PreView rack mount monitors, a WallView CCU HD-19 CAT-5 system to enable adjustments of color balance and brightness, a Cisco Codec C40 system, a Chief RPMAU Medium Duty Universal Projector Mount, a Da-Lite wall screen, and a Roland grand piano. (R4, tab 1 at 1-3) The solicitation required bidders "to submit bids that either meet or exceed the requested specification." It also stated: "Sellers MUST enter exactly what they are bidding (including make, model, and description)...in order for the bid to be considered." (R4, tab 4 at 3)

3. The Army received five bids in response to the solicitation. The highest bid was $293,080.32; Rhodes submitted the lowest bid of $205,897. (R4, tab 5 at 2)

4. In its bid, Rhodes stated that it was "an authorized vendor for all the products listed" in its bid and that its "personnel have completed all necessary manufacturer's certifications" (R4, tab 4 at 8). As a part of its bid, Rhodes offered to supply virtually all of the equipment set forth in the solicitation, including the Bose speakers and amplifiers (id. at 30-32). However, at the time when it submitted its bid, Rhodes was not an authorized dealer or vendor of Bose products. Moreover, it had not received any training on Bose systems, nor was it certified on Bose speakers. In early 2014, Bose examined Rhodes' application to become a Bose dealer and denied it (exs. G-4, -7 at 14-19; tr. 1/52-57).[1]

5. On 27 February 2014, the Army awarded Rhodes Contract No. W9124D-14-P-0133 in a total, fixed-price amount of $205,897. Item No. 1 was the A/V equipment and was

---

[1] We deny Rhodes' motion for ruling on the applicability of the deposition of Mr. Perez, the Bose representative involved with this contract which we deem to be a motion to strike. The deposition was taken with adequate notice to Rhodes, contains relevant material, and was helpful to the Board in resolving this appeal. We further note that Mr. Perez was unavailable at the time of hearing.

priced at $166,742.58; and installation and training was Item No. 2 and comprised the remaining $39,154.42. The contract defined the latter in these terms:

> Replace and install complete audio and video system according to attached PWS. Includes travel, engineering, documentation, installation, programming audio tuning, and project management.

(R4, tab 6 at 3) Consistent with both the solicitation and Rhodes' bid, the contract included an equipment list of 45 components, including the Bose speakers and amplifiers (*id.* at 19-20).

6. The contract incorporated by reference, inter alia, Federal Acquisition Regulation (FAR) clause 52.212-4, CONTRACT TERMS AND CONDITIONS–COMMERCIAL ITEMS (SEP 2013), which contained a host of provisions. Among them was "Termination for the Government's convenience" which provided:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

The clause also contained a "Termination for cause" provision which stated in part:

> The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the

3

> Government, upon request, with adequate assurances of
> future performance.

(R4, tab 6 at 5)

7. The contract set forth a performance period of 30 days. Accordingly, all of the contractual items were to be delivered and installed by 1 April 2014. (R4, tab 6 at 1, 4) At the hearing, appellant's owner (Ms. Rhodes) admitted that she never intended to perform the contract within the 30-day performance period. Ms. Rhodes stated: "We were never going to do 30 days. When I accepted it, I lied, but they always say 30 days but we were going to do it in 35 or so just, given everything." (Tr. 1/40)

8. On 27 February 2014, Ms. Rhodes forwarded an email to COL Byron J. Simmons, the chaplain in charge of the chapel, in which she stated: "You will have seen our technical proposal which covers much of the detail. However, if there are any changes you would like now is the time to fix them." She also suggested a site visit and inquired as to whether COL Simmons possessed any architectural drawings of the chapel. (R4, tab 7 at 3-4) On 28 February 2014, COL Simmons responded to appellant's email. He welcomed a visit. COL Simmons also stated: "No, I am sorry, I do not have any architectural drawings of the chapel. This is the reason we had the site visit."[2] In addition, he wrote: "At this point, I am not authorized to make any changes to the contract. It is as it stands." (*Id.* at 3)

9. On 2 March 2014, Ms. Rhodes forwarded an email to Mr. Manny Perez, Bose's territory manager for the Southwestern United States (ex. G-7 at 4), in which she wrote, in part:

> We have an engineering problem which I clean forgot
> to mention in the midst of the political fracas last week.
> The speaker system defined by the contract has no
> subwoofers which means that we will see a steep roll
> off below 60Hz. I tried to get this looked at in the
> bidding phase but the contracts officer was adamant
> that we bid what was asked.

Ms. Rhodes also wrote:

> To cut to the chase if we stick with the current design I
> am sure the customer is going to be very disappointed
> with the overall sound. How do we play the blame
> game? The contract at the moment is specific so there

---

[2] Rhodes did not conduct a site visit prior to contractual award (ex. G-3 at 20). In fact, it was alone among the five bidders in not conducting a site visit (tr. 1/142-43).

is no legal problem. However, I am very jealous of our reputation and hate to put our name to a substandard system. I suspect the design was given to government as being authorized by Bose [so] are you happy to have your name attached to shoddy work?

Ms. Rhodes completed her email by stating:

> We can then at least generate a proper design of what the speaker system should be. I will have to some extent come clean with the customer about my concerns to protect our position. They will doubtless tell me that there is no more money and ask us what we suggest. I would be very grateful if you could muse on the best strategy after that.

(Ex. G-4)

10. On 2 March 2014, Mr. Perez responded to appellant's email. He stated: "Please find attached contact info for Keith Stengl of AXXIS. AXXIS is the company we hope you can come to terms with to procure" the Bose Speaker System. (Ex. G-4 at 17)

11. In early March 2014, Ms. Rhodes conducted her first site visit of the chapel. She testified that she spent "a day-and-a-half down there doing the proper site survey and more critically acoustic measurements" (ex. G-3 at 21; tr. 1/67).

12. During the site visit, Ms. Rhodes informed COL Simmons that "she didn't really think the...system was going to work." He stated to her that the other bidders performed site visits to determine the government's needs. Ms. Rhodes then "proposed totally reworking the whole thing, which was frustrating, because COL Simmons did not "have the power to say what can or can't be contracted for." (Tr. 1/182-83)

13. Early on in the contract, Ms. Lisa Efird, the CO, asked that Rhodes coordinate matters with the contracting office (R4, tab 17 at 1). However, Ms. Rhodes continued to contact COL Simmons directly. On 13 March 2014, she sent an email to COL Simmons in which she wrote:

> I have been doing a lot of work with the audio performance of the system. The speaker arrangement contracted what might be used in a typical church setting when there is a single speaker talking to a congregation and overall quality is not a major issue. In this chapel we have very strong reflections from the

5

balcony and the rear wall which interfere with the outgoing sound; listeners in the front and center experience very deep fades in parts of the frequency spectrum (15-20db). The intelligibility in these parts of the chapel drops well below 0.5. Even if this was acceptable for local use it cannot be tolerated when there is sound augmentation when teleconferencing as the AES system will not be able to cope and we will get all kinds of nasty noises.

What to do? I have been working with the Bose engineers to try and find a good solution; as yet we have yet to reach consensus but we are closing in. We are agreed that we will need to add more speakers to cancel out the effect of the reflections; my preference is for two element arrays at the corners of the balcony (which would also include the subwoofers we need). After equalization the simulations shown this produces a very flat frequency response across the whole seating area and removes the deep fades completely. We also achieve intelligibility levels over 0.8 for the majority of the congregation. This approach does however reduce the localization (sound coming from the front) somewhat and maybe the system would need to be configured differently depending upon the use of the chapel (this is all under software control). An alternative suggestion is to incorporate additional speakers at the front to improve the localization but I remain to be convinced this is the better option – for one thing we can use the rear speakers to provide surround sound when replaying recorded video.

I am giving you an informal heads up that whatever architecture is settled upon we will need additional speakers and amplifiers to achieve the high quality result I think you are looking for. If we agree on my approach we would need four more RoomMatch speakers, two small subwoofers and two more eight channel amplifiers. There is no change to the rest of the hardware as the system is fully digital and everything else is managed in the software. Conventionally the subwoofers would be hung with the center cluster but

by putting them out of the way in the rear will to my mind be much better.

I understand we cannot change anything without going through contracts but I am trying to keep you in the loop with these design debates and feel out your opinion.

(R4, tab 10 at 2)

14. In mid-March 2014, Rhodes made its second and final visit to the job site. It removed approximately 150 feet of old cable from the chapel and installed an equivalent amount of new cable. This was the only equipment which Rhodes installed at the chapel. (Tr. 1/68-69, 183-84) During this visit, Ms. Rhodes stated to COL Simmons her belief that "there was going to be a need for many more speakers" and that the "sound board" needed to be redesigned significantly. She also spoke to COL Simmons regarding the need for a contractual modification. He testified that he referred her repeatedly to the contracting office. (Tr. 1/184-85) The CO never agreed to add any equipment to the contract (tr. 1/63).

15. Also in mid-March 2014, it became clear that Bose would not provide speakers to appellant (exs. G-4, -7 at 14-19). Thereupon, on 20 March 2014, Rhodes sent an entirely new technical proposal to the government's contracting office. It prefaced its proposal by stating: "It has become clear that the speaker system specified in the contract does not have the level of performance required to meet the different purposes planned for the building." Accordingly, Rhodes proposed the use of new QSC speakers and amplifiers, as well as other equipment not specified in either the solicitation or in Rhodes' original proposal. It quoted an additional cost of $39,870. (R4, tab 11, proposal at 3, 6-7)

16. On 25 March 2014, Rhodes sent an email to Ms. Michelle Bell, the contract administrator, explaining why the contract needed to be modified. She wrote, in part:

As soon as we received the contract we visited the site to make measurements. It soon became clear when we ran the numbers that the speaker system specified would neither deliver the level of sound nor the quality needed. Furthermore no account had been taken of the augmented teleconferencing deemed essential or provide support for piano music and surround sound. Over the next couple of weeks many hours were spent working with the acoustic models and the Bose engineers to see if we could devise an

7

architecture that could meet the performance objective by simply augmenting the specified units. Finally I had to accept that there was no practical solution given the building structure and even without that str[u]cture the costs were going to be prohibitive.

I then turned to a couple of other companies and eventually a solution was arrived at using QSC components that was both practical, reasonably priced and could fulfill everything asked of it and that is covered in the proposal. I also considered using Bose amplifiers with the QSC speakers but although this might be made to work, I was concerned that if we had post installation problems neither supplier would accept responsibility. QSC have underwritten the design now offered.

(R4, tab 13 at 2)

17. The CO was "somewhat blindsided when we got this additional proposal which increased costs by about $40,000" (tr. 1/132). As of 27 March 2014, Rhodes had not delivered or installed any equipment at the job site other than cables (finding 14). The CO's initial response was to terminate the contract for default (tr. 1/133); however, she ultimately decided to terminate the contract for the convenience of the government (R4, tab 20 at 1-3). Accordingly, the CO directed Rhodes to "[i]mmediately stop all work" and to "submit a detailed, final settlement proposal supported by adequate accounting data no later than 9 April 2014" (*id.* at 3).

18. On 4 April 2014, Rhodes forwarded its termination settlement proposal to the CO. Although it had only installed the cables and conducted two site visits, appellant contended that it was entitled to a recovery of $27,555.38 (R4, tab 22 at 6). As part of its proposal, Rhodes stated that it had cancelled all equipment orders, aside from the cables, at no cost (*id.* at 4-5).

19. On 4 April 2014, the CO forwarded an email in which she informed Rhodes that it would have to file documentation to support its claim. She wrote, in part:

Following is a list of the documentation we would need to see, in either case.

1. On your man-hours, we would need to see your payrolls. Additionally, we would need a description of what work was being completed....and the area of the

8

PWS where that requirement is listed/where does it apply. (Basically, just bumping the work up against the PWS on man-hours).

2. On the license, we would need a copy of the license and the receipt showing payment. We'd also need a brief description of why this was needed (similar to what you provided on email).

3. Cable and Cable Shipping....we just need to see the invoices.

4. Airport Shuttle, Air Fares, Accommodations and rental car....we would need to see the receipts for these.

5. Per diem, we really don't have to see anything on this but we need to match up your trips, # employees and such to substantiate the number of days.

(R4, tab 24 at 6) In response to the CO's request for documentation, Rhodes submitted an invoice for equipment and shipping in a total amount of $764.88 (R4, tab 25) and a Microsoft Project File purporting to show a progress schedule for the project (R4, tab 28 at 4). It did not provide any other documentation to support its proposal.

20. After examining the documentation proffered by appellant and conducting a walk through of the chapel, the government's contracting officials prepared this assessment of Rhodes' settlement proposal:

9

| CONTRACTOR'S PROPOSAL 3 APR 2014 | | | | |
|---|---|---|---|---|
| **Activity/Material** | **Grade** | **Qty** | **Cost** | **Ex Cost** |
| Technical Proposal | SME | 20 | $173.50 | $3,470.00 |
| System Engineering | SME | 22 | 173.5 | $3,817.00 |
| Acoustic Analysis | SME | 37 | 173.5 | $6,419.50 |
| Network Studies | SME | 8 | 173.5 | $1,388.00 |
| Install Planning | Eng Tech V | 16 | 44.3 | $708.80 |
| Remove old wiring | Eng Tech V | 12 | 44.3 | $531.60 |
| Install new wiring | Eng Tech V | 52 | 44.3 | $2,303.60 |
| AFMG Ease SW | License | 1760 euros | $2,427.00 | $2,427.00 |
| Cable | | | lot | $631.54 |
| Cable Shipping | | | lot | $133.34 |
| Airport Shuttle | ground | 6 | $72.00 | $432.00 |
| AirFares ELP/CVG | round trip | 6 | $454.00 | $2,724.00 |
| Per Diem | GSA | 14 days | $61.00 | $854.00 |
| Accommodation | GSA | 14 days | $95.00 | $1,330.00 |
| Car Rental | | 7 days | $55.00 | $385.00 |
| | | | | $27,555.38 |

| GOVERNMENT ALLOWANCE | | | | | |
|---|---|---|---|---|---|
| **Activity/Material** | **Grade** | **Qty** | **Cost** | **Ex Cost** | |
| Technical Proposal- never requested | | | | 0 | |
| System Engineering | Eng V | 5 | $38.03 | $190.15 | SCA |
| Acoustic Analysis – never requested | | | | 0 | |
| Network Studies – never requested | | | | 0 | |
| Install Planning | Eng I | 8 | 19.98 | 159.84 | |
| Remove old wiring | Eng 1 | 12 | 19.98 | 239.76 | |
| Install new wiring | Eng 1 | 16 | 19.98 | 319.68 | |
| AFMG Ease SW | License | | | 0 | |
| Cable | | | lot | $631.54 | |
| Cable Shipping | | | lot | $133.34 | |
| Airport shuttle – allowed rental car, not both | | | | 0 | |
| AirFares ELP/CVG | round trip | 4 | $454.00 | $1,816.00 | (Per Chaplain, only 2 trips X 2 people) |
| Per Diem | GSA | 5 | $61.00 | $552.00 | |
| Hotel | GSA | | | $415.00 | |
| Car Rental | | 7 days | $55.00 | $385.00 | |
| Health & Welfare | | 14 | $3.81 | $156.21 | |
| Profit | | | | 1,000 | |
| | | | | 5998.52 | |

(R4, tab 36 at 3) They concluded that appellant was entitled to recover the amount of $5,998.52. The CO also tried independently to verify Rhodes' costs, but was unable to do so. She testified: "But it all came down to when she submitted that initial listing of her cost. I had no way of substantiating it. The only invoice I received was for the cabling and the shipping of the cabling." (Tr. 1/137)

20. On 29 May 2014, the CO sent to appellant "the finalized modification of the Termination for the Government's Convenience." Based upon Rhodes' sole invoice, the CO allowed the amount of $764.88 for the cable and shipping. She concluded that appellant had completed 16.4 percent of the work under the contract's Contract Line Item No. 0002, which amounted to $6,421.33. Accordingly, the government's final determination allowed a total of $7,186.21 in termination costs. (R4, tab 38)

21. This appeal followed.

22. Following the termination of Rhodes' contract, the government entered into a follow-on contract to complete the work. The contractor successfully installed the A/V system in the chapel, using the specifications set forth in the original solicitation with only minor modifications (tr. 1/175-76). According to COL Simmons, the A/V system installed in the chapel "[w]orks beautifully" (tr. 1/185).

## DECISION

Pursuant to FAR 52.212-4, the Termination for the Government's Convenience clause, appellant is entitled to recover "(1) a 'percentage of the contract price reflecting the percentage of work performed,'" as well as "(2) 'reasonable charges' that...'have resulted from the [contract] termination.'" *Dellew Corp.*, ASBCA No. 58538, 15-1 BCA ¶ 35,975 at 175,783. Here, despite the lack of documentation, the CO labored to reach a fair result. She determined the percentage of work completed was 16.4% and paid Rhodes the full amount of its sole invoice.[3] Appellant is, thus, not entitled to an additional recovery.

_____

[3] The government has not challenged the CO's settlement determination in this litigation and we do not disturb it.

11

## CONCLUSION

The appeal is denied.

Dated: 7 June 2016

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59414, Appeal of Rhodes Research, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

12